Filed 12/18/15  In re B.P. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re B.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> C.P. et al., <br><br>     Defendants and Appellants. | A144609 <br><br> (Solano County <br> Super. Ct. No. J40436, J41019) |

C.P. (Father) appeals the termination of his parental rights as to his two daughters, B.P and B.F.P.  On appeal, he maintains the juvenile court erred in denying his Welfare and Institutions Code section 388[1] modification petition, and that the court should have applied the "parental benefit exception" to termination.  We affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]**

*I.*    *Background*

"Father and C.P.2 (Mother) were married in 2004.  Together they have two girls, B.P. (age nine) and B.F.P. (age four).  Mother has two older children from previous

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] On our own motion, we take judicial notice of our prior opinion in *In re B.P. et al.* (July 14, 2015, A142679 [nonpub. opn.].)  (See Evid. Code, § 451, subd. (a).) The factual background from our prior opinion appears in quotation marks.  Alterations are indicated by brackets.

relationships, I.N. [] and B.K. [].  B.K. lived with Mother and Father, while I.N. lived with her father in Texas and stayed with Mother in the summer only.

"Beginning in 2002, the Solano County Health and Social Services Department (Department) had been involved with the parents on five occasions due to substantiated allegations of domestic violence, and substance and alcohol abuse.  They fought in front of the children, and had both been arrested for domestic violence and child endangerment.  On one occasion Mother stabbed Father with scissors while cutting I.N.'s hair.  The Department did not remove the children from the parents' custody at that time because they immediately engaged in voluntary services."

## II.     The First Dependency Proceeding

"The Department became involved with the family again in September 2010 when Mother was about eight months pregnant with B.F.P.  On September 18, 2010, Mother was arrested for felony domestic violence and for possession of controlled substances. Father sustained scratches to his face and a busted lip.  The parents had argued over Father's excessive drinking, a habit that caused him to be arrested for public intoxication in March 2010.

"Based on the most recent domestic violence incident, the Department filed a petition on October 18, 2010, alleging B.K. (then 12 years of age) and B.P. (then four years of age) were at substantial risk of harm under section 300, subdivisions (b) and (c) due to the parents' history of domestic violence and substance abuse.[3]

"On November 16, 2010, the juvenile court found the allegations as stated in an amended petition to be true following a contested jurisdictional hearing.  The children remained in the home and the parents were offered family maintenance services.

"Mother gave birth to B.F.P. in December 2010.

"At the December 21, 2010 disposition hearing, the juvenile court ordered B.K. and B.P. to remain in the parents' custody with family maintenance services.

---

[3] "The allegations concerning section 300 subdivision (c) were subsequently dismissed."

"On August 9, 2011, the Department filed a petition alleging B.F.P. was at substantial risk of harm under section 300 due to the parents' domestic violence, Mother's substance abuse, and Father's alcohol abuse. The Department also concurrently filed a section 387 petition as to B.K. and B.P., alleging the same facts. Reportedly, Father was continuing to abuse alcohol and marijuana, and had also engaged in domestic violence with Mother. The children were detained and placed in foster care.

"On November 8, 2011, the juvenile court ordered B.P. and B.F.P. returned to Mother's custody with family maintenance services for both parents.[4]

"On September 18, 2012, the juvenile court terminated jurisdiction and granted the parents joint legal custody. Mother was given primary physical custody. Father was ordered not to operate a motor vehicle with the minors in the car, and to refrain from having contact with the minors after consuming alcohol."

### III.    The Second Dependency Proceeding

"On May 17, 2013, the Department filed a section 300 petition as to B.K., B.P., and B.F.P. Both parents had recently been arrested and charged with child cruelty, and possession of controlled substances and drug paraphernalia. Reportedly, law enforcement had gone to Mother's home following an anonymous tip and had discovered methamphetamine on a desk in her room. Both parents were in possession of pipes, and Father had a digital scale in his pocket. There was rotten food on the floor, an open bleach bottle in the bathroom, and a broken crib in the room where the children slept.

"On May 22, 2013, the juvenile court ordered the children detained. Mother and Father were granted supervised visits once a week for two hours.

"According to the June 13, 2013 jurisdiction/disposition report, B.P. and B.F.P. were placed with a nonrelated extended family member who had previously babysat the girls.[5] By this time, the parents were no longer incarcerated. Mother reported she currently did not use drugs and explained the drug paraphernalia found in the house was

---

4 "The parents had separated some time prior to May 2012."

5 "B.K. was placed with her paternal relatives."

3

old and was not recently used. However, she admitted she smoked marijuana regularly and predicted she would test dirty for methamphetamines. She did not believe her home was unsafe or unsanitary.

"Father reported he did not live with Mother and the girls, but visited regularly. He admitted he would test dirty for marijuana and alcohol. He was unwilling to contact the behavioral health assessment team for an intake appointment, claiming he worked for the government and his work schedule would not accommodate any classes. He also failed to drug test. He admitted there was domestic violence with Mother in the past, but denied any current domestic violence.

"An addendum report filed on July 31, 2013, indicated Mother had been hospitalized for her mental health issues. Her preliminary diagnosis was recurrent major depression. Mother disclosed alcohol, marijuana, and methamphetamine use. Father had visited his two girls and wanted to have custody of them, but did not currently have space for them. He planned on divorcing Mother. In the Department's view, Father 'seems to struggle in understanding the severity of the current dependency matter and the importance of his full participation.'

"On August 2, 2013, the parents submitted to jurisdiction. Mother and Father were ordered to participate in reunification services. Father was to participate in a parenting program, random drug testing, and a substance abuse assessment. The parents were granted supervised visits once a week for at least one hour.

"In a status review report filed on January 14, 2014, the Department reported Mother had been hospitalized twice and was arrested on August 30, 2013, due to a bench warrant. She was released in September 2013 after pleading guilty to a felony charge. She was on probation and was required to complete services. Reportedly, she appeared delusional and was not taking her psychotropic medications. Father tested positive for marijuana on September 27, 2013. He was arrested on October 4, 2013, for possession of known stolen property. He appeared intoxicated at the time of his arrest.

"Mother and Father blamed each other for their children's removal. Father had filed for divorce and claimed to be looking for appropriate housing for him and the girls.

4

While incarcerated, he enrolled in a recovery program. He was reportedly actively engaged in the program. Before his arrest, he did not enroll in any parenting education programs; however, he had participated in weekly counseling services at the jail since November 2013. From August through October he missed five weekly visits with his children, and had not had any visits since his incarceration. When he did visit, he was usually appropriate and engaged with his children.

"In the Department's view, parental progress toward alleviating or mitigating the causes necessitating out-of-home placement had been minimal. The children had encountered significant trauma and instability in their young lives, and B.P. had demonstrated several concerning behaviors, including sexualized behaviors and physical aggression. Although Father actively engaged in services while in custody, from May 2013 to his arrest in October 2013, he did not demonstrate any behavioral or cognitive changes. Nor did he engage in the court-ordered services. Neither parent appeared to understand why the Department was involved in their case or the negative impact their conduct had on their children. The Department recommended termination of reunification services as to both parents.

"On March 6, 2014, the court granted the Department's section 388 petition requesting Father's visits with the children be suspended while he was incarcerated. Father agreed and did not want his daughters to visit him while in jail.

"The six-month review hearing was continued several times at Mother's and Father's trial counsel's requests.

"At the contested sixth-month review hearing, held on June 17 and 18, 2014, the supervising social worker testified Mother was initially noncompliant with her case plan but had been actively engaged in a residential treatment program since March 2014. Father was only 'semi-compliant' with services. He did engage in a recovery program that included a variety of services, including substance abuse and parenting classes, while incarcerated. He had recently been released from jail, and he contacted the social worker several days after his release. Nevertheless, the Department recommended termination of services as to Father because he had been unwilling to engage in services during the

5

months prior to his incarceration. Additionally, the 12-month hearing date (July 15, 2014) was approaching and there was not a substantial probability that the children could be returned to the parents' care even if services were extended to the 12-month date.[6]

"Father testified he participated in a recovery program while incarcerated. The program included services to address anger management, coping skills, trigger management for drug addiction, and parenting classes. The program met for eight hours a week, and he participated in it over a 90-day period. He also participated in therapy with intern psychologists. He planned to attend 12-step meetings and obtain a sponsor. He also planned on raising the girls with the support of his parents, the current foster parent and other immediate family members. However, he currently lived at a homeless shelter.

"After hearing testimony and closing arguments, the juvenile court found that Mother had made substantial progress and granted her additional services to the 12-month review date. The court found Father had not made substantial progress and there was not a substantial probability the children would be returned to him by the 12-month date, which was only one month away. The court indicated it was not impressed with Father's efforts while incarcerated because there were no treatment records to corroborate his testimony. The court also was not impressed by the fact that he had prioritized his work over visitation with his children prior to his incarceration. The court terminated Father's reunification services, stating: 'I'm going to find that there wasn't sufficient progress to make a substantial . . . probability that the kids would be returned to him by the one-year deadline, so I am going to go ahead and order reunification services be terminated for the father.' The court also reduced Father's supervised visits from once a week to twice a month.

---

[6] "Section 361.49 provides: 'Regardless of his or her age, a child shall be deemed to have entered foster care on the earlier of the date of the jurisdictional hearing held pursuant to Section 356 or the date that is 60 days after the date on which the child was initially removed from the physical custody of his or her parent or guardian.' Here, the children were removed from custody on May 15, 2013. The 12-month period thus began running on July 15, 2013."

6

"A status review report filed for the 12-month hearing reported that Father was currently residing in a shelter. He had a successful visit with his children on July 1, 2014, and was scheduled for another visit at the end of the month. The Department renewed its recommendation to terminate reunification services as to Mother and to set the matter for a section 366.26 permanency planning hearing.

"On August 5, 2014, the 12-month hearing was continued to September 3 and 4, 2014. That same day, Father filed a notice of appeal from the orders rendered on June 18, 2014." (*In re B.P., supra,* A142679, pp. *1–*7.)

On July 14, 2015, this court issued our opinion affirming the juvenile court's denial of Father's reunification services. (*In re B.P., supra,* A142679.)

At the contested 12-month status review hearing, the juvenile court terminated reunification services as to Mother and scheduled a permanency planning hearing pursuant to section 366.26.

On October 14, 2014, Mother filed a petition for an extraordinary writ from the juvenile court's orders. This court denied Mother's petition on the merits. (*C.P. v. Superior Court* (Nov. 24, 2014, A142999 [nonpub. opn.].)

On November 10, 2014, Father filed a section 388 petition requesting additional reunification services. In support of his petition, Father indicated he had been clean and sober for 13 months, and had been participating in the Rays of Hope residential substance abuse program for the past four months.

On November 19, 2014, the Department filed a report opposing Father's section 388 petition. The Department noted Father was participating in recovery classes two times a week, and was randomly drug testing without concern. He was also participating in an anger management class. However, he had only completed five months of the nine-month substance abuse program, and the program did not offer parenting classes or domestic violence classes.

Father was generally appropriate with the children during his monthly supervised visits, but the children appeared traumatized afterwards. The children wet their pants and had difficulty sleeping. B.F.P. defecated in her pants, and her therapist opined that the

7

child engaged in trauma reenactment in her play therapy. B.P had cut her eyelashes after a visit on October 15, 2014.

On December 10, 2014, Mother filed a section 388 petition, also asking for reinstatement of reunification services. The Department similarly opposed Mother's petition.

## IV. Selection and Implementation Hearing

### A. Department Reports

On December 14, 2014, the Department filed a section 366.26 report recommending that the juvenile court adopt a permanent plan of adoption for the children. Although B.P. continued to struggle with physical aggression and sexualized behavior, she had made progress with therapy and in-home services. B.F.P. was also addressing her behavioral issues in therapy. Both children showed an ability to bond with parental figures and form healthy attachments to their care providers. As a result, the Department believed they were adoptable individually and as a sibling group.

The children had been in their current placement since October 2013. The caregiver had also served as their foster parent for four months during the first dependency proceeding, and had kept in contact with them. She came forward when she learned the children had again been removed from their parents' care. B.P. expressed a desire to live with Mother, but indicated that she also enjoyed living with her care provider and wanted to stay with her. B.F.P. was too young to express an understanding about adoption. The caregiver was interested in adopting both children, and demonstrated to the Department that she was able to take care of the children's needs.

Father was reportedly doing well and was still enrolled in the Ray of Hope program. However, he had about four more months before he would complete his residential program, and he would need to participate in parenting and domestic violence classes that had not yet been implemented. While the children could visit Father overnight at the program, there was no guarantee that the children could live with him there.

8

On February 13, 2015, the Department filed an addendum report. The Department reported the care provider was having some behavioral difficulties with an older daughter whom she had adopted previously. The caregiver decided to send her to a therapeutic placement to get the professional help she needed. In spite of these difficulties, the Department opined the home remained an appropriate placement for the children.

### B. The Hearing

#### 1. Father's Section 388 Petition

The combined contested section 388 hearing and section 366.26 hearing commenced on February 20, 2015. Father's residential program case manager testified that the Rays of Hope program is a Christian-based clean and sober living environment, not a licensed residential substance abuse treatment program. He reported Father was very diligent in adhering to the program and was open during meetings. He had tested clean during random testing and did not show signs of substance abuse. Father actively participated in anger management, life skills, and parenting classes; however, the facility does not have a domestic violence curriculum. He also participated in job skill training and worked at a thrift store. Potentially, he could be trained for a paid position with Mission Solano shelter after completing the program. While they had briefly discussed the circumstances surrounding this dependency proceeding, the case manager had no knowledge of whether Father was in a position to meet the needs of his children.

The real property manager from the senior complex at which Father had worked previously opined that Father was committed and competent. He was an excellent caregiver and demonstrated he was a genuine and caring person.

Father's Narcotics Anonymous sponsor testified Father was working on step two of the 12-step program. Father had worked up to step four, but reverted back to step two. The sponsor believed Father was in a position to care for his children.

Father testified his current period of sobriety started after he was taken into custody in October 2013. During his incarceration, he participated in a substance abuse program. After his release in June 2014, he went to Mission Solano and joined the Rays of Hope program. He planned on completing a year in the residential program, after

9

which he would remain sober and obtain full-time employment. He wanted the Department to support him while he received reunification services, with the goal of becoming a single parent for his children.

Father acknowledged the children had once walked in on him and Mother having sexual intercourse, and they witnessed physical violence between the parents in the past. He stated that his relationship with Mother was toxic, which was why he had petitioned for divorce. While his visits with the children were positive, he conceded he was not ready to have them returned to him.

The adoptions social worker testified that it was in the best interests of the children to not reinstate services for the parents, because the children were doing well with their present caregiver. The girls needed stability and structure given their history of trauma. Because of the structure in the caregiver's home and the services that were being provided, the children's aggressive and sexualized behaviors had lessened over time. Though they continued to have behavioral issues, their difficulties appeared to be associated with visits with their parents. Both children had expressed to their therapists that they feel anxious before visits. B.F.P. would wet her bed and have difficulty sleeping at night. The social worker opined the children would need additional counseling if reunification services were offered because they would have anxiety about possibly being returned to their parents.

After hearing closing arguments, the juvenile court found that while Father had demonstrated changed circumstances in the last several months, he still had work to do in his sobriety and was not ready to receive the children. Weighing the age of the children, the history of the parents' problems, and the need for permanency, against the recent problems in the caregiver's home with her older child and the bond B.P. and B.F.P. have with their parents, it was not in the girls' best interest at this stage in the proceedings to begin reunification services again. Instead, it was in the children's best interest to seek permanency as soon as possible. The court denied Father's section 388 motion.[7]

---

[7] The juvenile court also denied Mother's section 388 petition.

10

### 2. *Termination of Parental Rights*

The social worker testified there were no impediments to the caregiver being approved to adopt the children if the juvenile court terminated parental rights. Alternatively, other families would be open to adopting the siblings. Both children are extremely bonded and attached to the caregiver and see the caregiver's home as their home. While they are bonded with Mother, they also identify the caregiver as their mother. B.P. understood adoption meant that she would still have ongoing contact with her parents and her paternal grandparents. Even if the caregiver was not agreeable to postadoption contact with the parents, the social worker would still recommend termination of parental rights.

The caregiver testified that if the parents remained clean and sober she would allow the girls continued contact. She preferred to adopt the girls as opposed to being their legal guardian. In her opinion, stability and permanency would have a positive impact on their ability to work in therapy and resolve issues from the trauma they sustained while in their parents' care.

In deciding to terminate parental rights, the court indicated it found the caregiver's testimony with respect to the girls' need for permanency to be very compelling. Permanency solidifies a sense of safety in a child's mind, and the interests of the child is paramount once the proceeding is past the reunification stage. The court found the children were generally and specifically adoptable by clear and convincing evidence. It also found by clear and convincing evidence that the benefits of permanence outweighed any detriment resulting from the termination of parental rights. Based on the evidence, the court believed the alternative option of guardianship would perpetuate a sense of uncertainty, which would not be good for the children in light of the trauma they had experienced. The court terminated both parents' parental rights. Both Mother and Father have appealed. However, Mother argues only that we should reverse the order as to her if we reverse the order terminating Father's parental rights.

11

## DISCUSSION

### I.    *The Denial of Father's Section 388 Petition*

Father contends the juvenile court erred by denying his section 388 petition. "A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; § 388, subds. (a)(1), (c)(1)(A).) A parent who files a petition at the time of the section 366.26 hearing when he or she has no reunification services has a particularly weighty burden because at that point "a parent's interest in the care, custody and companionship of the child is no longer paramount" and "the focus shifts to the needs of the child for permanency and stability." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

In *In re J.C.* (2014) 226 Cal.App.4th 503, 526–527, the appellate court concluded the appropriate standard of review to apply after reunification services have been terminated is whether a parent petitioning for an order reopening reunification efforts has established that such a change will advance the child's need for permanency and stability. (*Id.* at p. 527.) The juvenile court is afforded "sound discretion" in deciding a section 388 petition, and "its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)

The juvenile court's denial of Father's section 388 petition was not an abuse of discretion. Although Father had made notable progress in his substance abuse treatment, the court reasonably concluded that he did not establish granting the section 388 petition was in the children's best interests. At the time of the hearing, the B.P. and B.F.P were eight and three years old, respectively. They had not been in their Father's care for over a year and a half. They had lived with their caregiver during the entire dependency proceeding, as well as for several months during the prior proceeding, and the Department had approved the caregiver as an adoptive parent. The girls were doing well in her home, and their severe behavioral problems had lessened. Father's substance abuse problem was serious and long lasting, and he had domestic violence issues with

Mother as well. Additionally, he did not have suitable housing for the children and admittedly was not ready to have them returned to his care. Granting his petition would have subjected the children to further uncertainty and instability.

Under these circumstances the juvenile court was within its discretion to conclude that moving toward permanency was in the children's best interests. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594 ["prospect of an additional six months of reunification to see if the mother would and could effectively separate from the father would not have promoted stability for the children and thus would not have promoted their best interests" when change of order requested on eve of § 366.26 hearing].)

## II. *The Court Properly Declined to Apply the Beneficial Parent-Child Relationship Exception*

Father contends the court erred by declining to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). "At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans." (*In re S.B.* (2008) 164 Cal.App.4th 289, 296–297.) "Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)." (*Id.* at p. 297.) To establish the beneficial relationship exception, Father must demonstrate he "maintained regular visitation and contact" with the children and they "would benefit from continuing the relationship" with him. (§ 366.26, subd. (c)(1)(B)(i); *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.)

"The 'benefit' prong of the exception requires the parent to prove [that] his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.] No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.] The relationship

13

that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.] Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

The parental relationship exception "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) We review a juvenile court's order on the beneficial relationship exception for substantial evidence, but would reach the same result applying the abuse of discretion standard of review. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166 & fn. 7 [noting "some courts have applied" the abuse of discretion standard].)

Father did not establish the children would benefit from continuing the parental relationship. It is true that the girls had a bond with their Father, and their visits generally went well. His visits, however, were always supervised and he was still in the early stages of his sobriety. Additionally, he did not maintain consistent visitation during the span of this dependency proceeding, even before his incarceration. He had only been visiting once a month since his release from custody in June 2014.

"A parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child . . . .' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated." (*In re C.F.* (2011)

14

193 Cal.App.4th 549, 555, fn. omitted.) The parental relationship exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

By the time of the section 366.26 hearing, the children had spent much of their young lives in the dependency system. In the case of B.F.P., it was the majority of her life. The girls had developed a strong bond with their caregiver, even referring to her as their mother. While in her care, the children's behavior had improved. Significantly, both children experienced behavioral regression after visiting with Father, including incontinence and trouble sleeping. Under these circumstances, Father failed to establish his relationship with the girls promoted their well-being to such an extent that it outweighed the well-being they would gain in a permanent home an adoptive parent. While it is evident that Father cares deeply for his children, he has not shown the juvenile court erred in terminating his parental rights.

We conclude the court properly declined to apply the beneficial relationship exception to termination of parental rights. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 [appellate court will affirm juvenile court's order if supported by substantial evidence, even if other evidence supports contrary conclusion].)

## DISPOSITION

The juvenile court's orders denying Father's section 388 petition and terminating Father's and Mother's parental rights are affirmed.

15

_____
DONDERO, J.

We concur:


_____
HUMES, P.J.


_____
BANKE, J.